**PALISADES CITIZENS ASSOCIATION, Incorporated, Ann Turner White, Louis F. Oberdorfer and Elizabeth W. Oberdorfer, Plaintiffs,**

v.

**Frank E. WEAKLY, Alan W. Payne, James G. Tyson, Members of the Alcoholic Beverage Control Board of The District of Columbia, MacArthur Liquors, Inc., Defendants.**

Civ. A. 2032–58.

United States District Court
District of Columbia,
Civil Division.
Aug. 22, 1958.

**592**

James Earnest, Washington, D. C., for plaintiffs.

Robert Wise, J. E. Bindeman, Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

Plaintiffs seek a preliminary injunction enjoining the operation of a liquor store at 4881 MacArthur Boulevard, alleging that the license was not granted in conformity with the District of Columbia Alcoholic Beverage Control Act.

The relevant portions of the Act with which the Court will be concerned in this opinion are as follows:

"(a) Any individual, partnership, or corporation desiring a license under this chapter shall file with the Board an application in such form as the Commissioners may prescribe, and such application shall contain such additional information as the Board may require * * *. Before a license is issued the Board shall satisfy itself:

\*   \*   \*   \*   \*   \*

5. That the place for which the license is to be issued is an appropriate one considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood of the premises for which the license is desired.

"(b) Before granting * * * a retailer's license, * * * the Board shall give notice by advertisement. * * * There shall also be posted by the Board a notice, in a conspicuous place, on the outside of the premises. This notice shall state that remonstrants are entitled to be heard before the granting of such license and shall name the same time and place for such hearing as set out in the public advertisement; and, if remonstrance against the granting of such license is filed, no final action shall be taken by the Board until the remonstrant shall have had an opportunity to be heard, under the rules and regulations prescribed by said Board. * * *

"(c) * * * no place for which a license under this chapter has not been issued and in effect on the date the written objections hereinafter provided for are filed, shall be deemed appropriate if the owners of a majority of the real property within a radius of six hundred feet of the boundary lines of the lot or parcel of ground upon which is situated the place for which the license is desired, shall, on a form to be prescribed by the Commissioners filed with the Board, object to the granting of such license. * * * This subsection shall be construed as a limitation upon the discretion of the Board in granting a license and not as a limitation upon the discretion of the Board in refusing a license * * *." D.C.Code, Title 25, Sec. 115, 48 Stat. 327–329, ch. 4, § 14.

Thus under 14(c) of the Act, if a majority of the property owners within six hundred feet of the proposed location object, the Board must deny the license. If this provision is not applicable, then under 14(a–5) the Board in its discretion may deny a license considering the character of the premises and the wishes of the persons residing or owning prop-

erty in the neighborhood. The Act further provides for any protestant to have a hearing under the rules and regulations provided by the Board to determine the applicability of either of the above sections.

The facts giving rise to the present motion are as follows:

For some time, various liquor dealers have sought permission from the Alcoholic Beverage Control Board to operate a liquor store along MacArthur Boulevard. By means of consistent, organized protest, both as individuals and as the Palisades Citizens Association, Inc., the residents of the area had successfully prevented any such establishment from gaining a license. The vehemence and duration of the protest is best seen in an opinion of the Board in denying an application for a Class "A" license at premises 5432 MacArthur Boulevard in 1955. The Board said:

"(9) That the records of this Board show that for the past twenty years the residents and property owners along MacArthur Boulevard have strongly opposed the placing of a package store in the neighborhood. Repeated filing of applications has had the result of harassing these people and imposed an unwarranted burden and cost upon these citizens and upon the several Departments of the Municipal Government. Unless any future prospective applicant for such license in this area should first obtain definite evidence that a great majority of the residents and property owners of the immediate neighborhood actually favor a Retailer's Class 'A' License therein, such prospective applicant may well expect any application for such license will be denied by the Board.

\*    \*    \*    \*    \*    \*

"(10) Prior to this hearing these applicants were warned of the neighborhood sentiment, and it is amazing that they proceeded with this application having so little support for it. The Board believes that before an applicant is again afforded a hearing for a license in the MacArthur Boulevard area such an applicant should first be required to submit evidence which would reasonably indicate a definite change of sentiment in the neighborhood. \*    \*    \*"

It should be noted that Bassin (the dominant voice of the defendant MacArthur Liquors, Inc.) had applied for a license in the area three times during the past four years.

On October 29, 1957, by a vote of two to one, the Board granted a liquor license for the premises 5136 MacArthur Boulevard. Over four hundred people had protested, but the Board granted the license saying, "by the best means available to it the Board has ascertained that within this neighborhood there is an adult population of approximately 1,700 persons, and the Board finds further that those persons who did not voice objection to the issuance of this license outnumbered by about three to one those who protested its issuance."

The Palisades Citizens Association, Inc., one of the plaintiffs in this case, sought review of this action of the Board in a case now pending before the Court of Appeals for the District of Columbia. The District Court held that the Association did not have the capacity to sue, but did not go into the merits of the Board's determination.

The sole stockholder of MacArthur Liquors, Inc., the successful applicant for the premises at 5136, died and all of the stock, except one share, was transferred to Aaron Bassin and his wife to hold as tenants by the entirety.

A short time later, MacArthur Liquors, Inc., filed an application with the Board to transfer its license to 4881 MacArthur Boulevard. The residents of this area circulated petitions and some four hundred twelve persons protested the transfer. These signatures were obtained on two different forms provided by the Board. These forms are identical in almost all respects. The significant difference, as the Board saw it, was that one, in its preamble, recited that the undersigned "residents and/or owners"

object to the issuance of a license "under Section 14(a–5)", while the other states that the undersigned "being the owners of the real property" protest "under Section 14(c) of the District of Columbia Beverage Control Act". The 14(a–5) petition then has on each line a place for the petitioner's name, a space to fill in either "owner" or "resident", the number of the square or parcel, the lot, and the address. The 14(c) petition has a place for the petitioner's name, the square or parcel number, the lot, and the address. There is no space on this form to state whether the signer is a resident or owner.

At the hearing held in accordance with the statute, two questions were raised with respect to the signatures on the petition. The protestants argued that the word "owners" in Section 14(c) should include tenants. The Board interpreted the statute not to include possessors of only leasehold interests.

The protestants further alleged that a majority of the property owners, even excluding tenants, had signed against the liquor store, but that some had signed on one form, some on the other. The Board held that the statute limited protests with respect to 14(c) to the one form prescribed by the Board and excluded from consideration on the 14(c) question all petitioners who had signed on the 14 (a–5) form.

On the 14(a–5) issue there was submitted to the Board fifteen[1] letters in favor of the transfer. Five of these letters were solicited by the applicant and about half of the unsolicited letters seem motivated more by their desire to have the store removed from its present location at 5136 rather than a positive sentiment in favor of a liquor store at 4881. Thus the letter of Frederick R. Pettis says: " * * * I believe the new location is the proper site for a liquor store. Its present location is more of a residential area than the heavy commercial area in the 4800 block of MacArthur Boulevard. * * * " Another example is that

of Charles E. Perry: " * * * Recently I have purchased a home at 5225 Manning Place, N. W. and, from a personal viewpoint, this liquor store in the commercial district would not be as objectionable as it is in its present location. * * * "

After the hearing was over, the Board drove about to survey the neighborhood. However, it is unclear to the Court how large an area was inspected. They returned to their office and took out maps and on the basis of these and of their survey, delineated what they considered to be a "neighborhood" within 14(a–5). They then counted the number of houses in the neighborhood thus delineated. A call to the Bureau of the Census by someone in the office resulted in the use of the factor 2.4 to determine the number of adults in the neighborhood. On the basis of this computation, the adult residents of the neighborhood were postulated at 929. The petitions were turned over to the Board's analysis section which checked how many property owners had signed the 14(c) form and how many residents of the "neighborhood" had signed both forms. It was determined that only 20% of the property owners had signed the 14(c) form and thus validly protested under 14(c) and 44.4% of the "neighborhood" had registered objection under 14(a–5).

The Board granted the transfer, saying:

" * * * Analysis of the petitions allegedly signed by residents and/or property owners within the area delineated by the Board as constituting the "neighborhood" of applicant's premises as contemplated in the Act, showed that some 412 persons voiced objection to issuance of the said license. By the best means available to it, the Board has determined that within this neighborhood there is approximately a population of 929 adults, of whom 412 are alleged to have signed petitions. The Board further finds that there are in the

1. Sixteen letters were submitted in evidence to the Court, but two of these

were from the same individual, Charles E. Perry.

neighborhood large undeveloped areas. After substantial study of the petitions in opposition, and methods pursued in obtaining them, and all other matters related to consideration of this application for transfer, that to issue this license is well within the discretionary power of the Board under the Statute, and would not be contrary to the provisions of Section 14(a)5 of the Act. * * * "

Bassin's attorney notified him by phone of this decision on the 5th of August at 8:30 a. m. and advised him to go to the Board to receive his license. Bassin had made definite arrangements for this eventuality before the granting of the license and apparently assumed a favorable decision on his application for a transfer. His wife contacted the various laborers, who had been placed on call, while he was processing his license at the Board. He received his license at 9:52 a. m. Fifteen minutes before 11:00, less than an hour later, MacArthur Liquors was operating a liquor store at 4881 MacArthur Boulevard.

Upon questioning by the Court, Bassin attributed this haste to a desire to minimize losses during the transfer. He was asked whether he realized that there was a danger of a lawsuit. He answered that he had no reason to believe anyone would take the issue to court. Since one case involving almost the identical parties had been taken to court—in fact was and is still pending—and the plaintiffs had twice specifically requested the Board in this case to postpone the effective date of the Board's ruling in order to give them time to go to court should the decision be adverse to the protestants,[2] Bassin's statement appears to lack candor.

They telephoned licensee's attorney at 2:30 P.M. and notified him that, if possible, they would seek a restraining order that afternon—in any event, the following morning. Licensee himself did not receive notice of this call until late that evening, about 10:00 p. m. After this notice he continued to take steps to transfer refrigeration equipment, inventory, and shelves from one store to the other.

The following day at 9:15 a. m. counsel for all parties met in chambers and by 10:30 it was decided by the Court that a temporary restraining order would issue. Defendant's counsel had objections to the form of the order and it was agreed that the order would be rewritten and submitted to the Court later that afternoon. About 3:00 p. m. all counsel and Bassin met in chambers when the temporary restraining order was signed. Despite the fact that Bassin had actual knowledge that the Court had restrained the operation of his liquor store and had suspended his license at 4881, he continued to sell liquor at the new address and to take steps facilitating transfer from 5136— not terminating his activities until formally served with the Court's order late that evening. Bassin's action, beginning the morning of August 6th, the date of the restraining order, were admittedly taken with knowledge of possible legal obstacles and were—in his words—"a calculated risk".

The plaintiffs, three individuals, all living within six hundred feet of 4881 MacArthur Boulevard, and the Palisades Citizens Association, Inc., at the same time they filed for a temporary restraining order, brought suit in this court alleging that under 14(c) and 14(a–5) the action of the Board was arbitrary and was made without promulgating rules and regulations as required by 14(b) of the statute. Plaintiffs seek before this Court a preliminary injunction pending determination of the main action.

Defendants have raised initially the objection that plaintiffs have no standing to sue because they have suffered no damage to distinguish them from the general public. Counsel for defendant MacArthur Liquors has taken the position in oral argument that "possibly" persons immediately adjacent to the

2. p. 9 Transcript of hearing before A.B.C. Board held May 5, 1958.

p. 17 Transcript of hearing before A.B.C. Board held July 15, 1958.

new liquor store location would have standing. Plaintiffs have cited cases to the contrary.[3]

The question is a significant one because of the sensitive area left to the Board's discretion. In order to protect a citizenry from unwarranted exercise of that discretion, there must be adequate judicial review. The suggestion by defendant's counsel that the right be limited to store owners immediately adjacent would be too restrictive. Nor does the Court feel that D.C.Code Title 25, Sec. 106, in granting the right of an unsuccessful applicant to appeal from the Board to the *Commission*, intended to limit appeal to the *Court* to unsuccessful applicants.

The statute, on the contrary, gives property owners within six hundred feet an absolute right over the Board to prevent by their protest the granting of a license. If their right is to be protected, the statute must contemplate appeal to the courts should the Board arbitrarily ignore their protests.

The same is true with respect to those presenting "the wishes of the neighborhood" under Sec. 14(a–5). The Palisades Citizens Association, Inc., representing property owners and residents in the neighborhood, and the three individual plaintiffs who own property and live in the neighborhood area took an active interest at the hearing to present the "wishes of the neighborhood". To protect them against arbitrary action contrary to the standard of 14(a–5), review to the courts should be afforded.[4]

The importance of citizen representation before the Board and in the courts has been excellently explained recently in an article studying the procedures before Alcoholic Beverage Control Boards in the United States:

"Perhaps then resolution of the policy question of whether ordinary protestants should be heard in the issuance process should depend upon the agency's judgment as to the capacity of its staff fully to perform its responsibilities. * * *

"Solving the problem on the practical basis of whether protestant participation will better inform the agency may oversimplify the issue. Licensing unqualified retailers can create serious community problems. Establishment of an outlet for on-premise consumption in or near a residential neighborhood may bring about a reduction in property values;

3. There is authority to sustain either position.

    Contra right to sue: In re Seitz, 157 Pa.Super. 553, 43 A.2d 547 (remonstrant has no standing); Glen Burnie Improvement Ass'n v. State Appeals Board, 213 Md. 407, 132 A.2d 451; Strickland v. Knight, 1904, 47 Fla. 327, 36 So. 363; Baltimore Retail Liquor Package Stores Ass'n, Inc., v. Kerngood, 1937, 171 Md. 426, 189 A. 209, 109 A.L.R. 1253 (competitor has no standing).

    Holding in favor of standing to sue: Bagby v. Bowen, 1935, 180 Ga. 214, 178 S.E. 439 (taxpayer); Frank v. Hub Liquors, 1935, 244 App.Div. 496, 279 N.Y.S. 636, affirmed 1936, 268 N.Y. 688, 198 N.E. 559 (taxpayer and competitor have standing); Retail Liquor Dealers Protective Ass'n v. Shreiber, 1943, 382 Ill. 454, 47 N.E.2d 462 (assoc. has no standing but taxpayer as a citizen could maintain action); In re Azarewicz Liquor License Case, 1948, 163 Pa.Super. 459, 461, 62 A.2d 78, 79 ("Since the stat-

ute provides that the board may refuse a license for premises within 300 feet of a church, the legislative intent is clear that a church has a direct interest to protect and to be protected, and was given a status above and different from that of a remonstrant.").

4. There has been cited to the Court Palisades Citizens Association, Inc. v. Weakly, et al., C.A. 1086–58 where another judge of this court held that the Association did not have standing to sue. In that case, however, the Palisades Citizens Association had participated in the hearing in October, 1957, while the Palisades Citizens Association, Inc. was bringing the suit. There was no showing of what interest the corporation had in the proceedings. Furthermore, the license had been renewed without protest by this group in the interim. The order itself does not specifically state the basis for the ruling. The recent case of N.A.A.C.P. v. Alabama, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 may also affect the results of the above case.

it may also create a hazard for the youth of the neighborhood. For these and other reasons members of the community or neighborhood may have or feel they have a vital interest in seeing to it that there is full compliance with the restrictive provisions of the applicable alcoholic beverage control act. Unless there are strong reasons to the contrary, persons whose vital interests are being affected by administrative action of an adjudicative nature should be heard when those interests are in jeopardy. Not only will their participation most likely assist in developing all the relevant facts and arguments but their legitimate feelings that they should be heard will be satisfied.

"Moreover, encouraging participation of this character should tend to counteract undesirable political or pressure group influences on the licensing agency. In theory, administrative agencies represent and protect the public interest. In practice, only too often 'our commissions have been run by officials who are merely the pale reflection of the very interests they are supposed to regulate'. The dangers of political control of licensing agencies are amply demonstrated by the history of alcoholic beverage control before the Eighteenth Amendment; and there is no reason to believe that political influence is non-existent today. One means of combatting political or pressure group influences is to encourage participation in the issuance process by those who have an interest adverse to the applicant. Adversary hearings of course will not prevent a venal licensing agency from operating venally. But adversary hearings, involving as they do a decision on the record, will make it somewhat more difficult for such an agency to disregard the statutory standards, *particularly if the protes-tant also is accorded a right to judicial review. * * * "*[5]

Plaintiffs allege damage to their real estate values and to the character of the neighborhood should the liquor store continue in operation pending trial of the main action. The dangers inherent in the operation of this type of business were noted by Congress, and, therefore, the legislature was careful to protect a community from unwanted stores of this nature. Courts, too, have recognized their danger:

"* * * It may be conceded at once that the liquor business is not one in which a person has a natural right to engage because it is potentially dangerous to the community. It may also be conceded that there is a wide difference between the discretion reposed in and exercised by a board having jurisdiction to issue a license for the sale of alcoholic beverages and that which is vested in a board to license callings in which one has a vested right to engage. * * * " Clore Restaurant v. Payne, D.C.1947, 72 F. Supp. 677, 681.

After carefully reviewing the evidence in this case and the affidavits of the real estate agents submitted by both plaintiffs and defendants, the Court finds that the continued operation of this store would result in irreparable injury to the plaintiffs.

This brings the Court to the merits of the case: "whether there is enough to substantiate plaintiff's claims so as to move the court in the exercise of a sound discretion to intervene in its process" pending trial of the main action. Pang-Tsu Mow v. Republic of China, 1952, 91 App.D.C. 324, 201 F.2d 195, 199, certiorari denied 1953, 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356.

With respect to the validity of the protests under 14(c), the Court feels this issue is best resolved at the time of trial and therefore expresses no opinion on the

---

5. Byse, "Opportunity to Be Heard in License Insurance" 101 U. of Pa.L.Rev. 57, 90–91 (1952) [Emphasis supplied].

propriety of the Board's interpretation of the word "owners" and its refusal to consider protests registered on a form, for practical purposes, identical with the one provided by the Board.

Regardless of the validity of the Board's determination, it does appear to the Court that the failure to permit a continuance, as requested, to allow property owners to re-sign on the proper form in order to give legal force to their objection, has the effect of ignoring the wishes of these people and is not good administrative procedure.

The issue under 14(b), however, is clear and indicates an unfortunate absence of operating rules and regulations in a very sensitive area contrary to the statute. That this absence was felt is proved by petitioners' frequent requests for rules and regulations to guide them. Thus, on May 5, 1957, counsel for the petitioners addressed the Board as follows:

"Insofar as I am advised, and it is one of the difficulties I have run into in our prior appearances, I am —we are not aware of any rules and regulations by which Congress by its mandate prescribed and said, and I have no doubt for the protection by the Citizens' Association, and I know not what the rules and regulations are, so that I ask in the alternative, as at the beginning, that the hearing on this application be continued until you have—shall have rules and regulations in this proceeding so that I may protect my rights accorded me under the law. * * * "

Transcript of hearing p. 6.

On July 15 the request was repeated:

"Mr. Oberdorfer: These owners join individually with the past— with the motions of the Palisades Citizens' Association.

(off the record discussion at this time)

"Mr. Oberdorfer: And because this Board is without authority to grant it without rules and regulations."

*   *   *   *   *   *

"The Chairman: So, the second motion is you contend that the Board is without authority to make a decision because there are no rules of procedure?

"Mr. Oberdorfer: Right." Transcript of hearing pp. 10 and 12.

If, then, any rules were in existence at this time, they were never shown to the protestants despite their repeated requests.[6]

Petitioners' need for rules was a real one. At key times during the hearing, petitioners were told they had not conformed to what the Board considered proper procedure or to "the common rule".[7]

There has been submitted to the Court two and one-half typewritten pages entitled "Rules of Procedure, Alcoholic Beverage Control Board of the District of Columbia" promulgated October 15, 1938, which, it is suggested, fulfill the requirements of the statute. Insofar as they would apply to a hearing under 14(b) they are reprinted in full below:

"7. * * * The Administrative Assistant shall notify all protestants, individually or through the organization they represent, as to the date when protests are to be heard.

"8. The protestants shall have the right to open and close the argument.

"9. After hearing all protestants and all parties appearing in favor of the granting of the license, the Board shall, in the exercise of the

---

6. Besides the instances quoted in the text, see transcript of the hearing at pp. 13 and 52. Defendant's counsel, however, had a copy of the rules. p. 10 of transcript of hearing, May 5, 1958. At the hearing before this Court, plaintiffs' counsel stated he had never seen the rules offered in evidence; defendant's counsel that these were in his possession at the time of the hearings.

7. Transcript of hearing of July 15, pp. 13–14, 17, 52, 59–60.

discretion vested in it by Congress, and at its earliest convenience either grant or refuse the license. The protest or approval of no one individual or organization shall carry any more weight in the consideration of the Board than shall the protest or approval of any other individual or organization which may assume the opposite side of the argument. * * * "

The inadequacy of these rules to comply with the statutory requirement is manifest and appears to have been acknowledged by the Board itself. Thus there was a Committee of the District Bar Association working on drafting a set of rules and regulations to secure to protestants the right guaranteed them under the statute. Whatever may be the adequacy of the rules to come, the present set is woefully inadequate, a token compliance with the statutory prerequisite.

The petitioners could have discovered nowhere what method the Board was to use to determine its vital statistics or how the Board wished petitioners to present their proof.

The danger of operating in a procedural vacuum is seen when this case is given closer examination. The six hundred foot radius and the "neighborhood" were both constructed after the hearing and the Board knew the number of protestants. No opportunity was afforded persons who, not knowing they were within the Board's determination of these areas, to express their position.

The method determining the adult population instead of being "the best means available" has little chance of success. No relationship is known between *houses* and adult population. The factor of 2.4 secured by a telephone call to someone unknown at the Census Bureau relates *households* and adults over the entire United States. Even here, the Board's figure is outdated. The figure has been steadily dropping and the proper factor is presently 2.2.[8]

The factor further does not take into consideration the fact that it is a suburban community in a relatively densely populated area in the eastern United States. Housing block statistics in the area or census tract statistics, for example, would give a closer approximation to the correct number of adults residing in the community.

These facts and the failure of the Board to prescribe rules and regulations to allow a fair hearing for remonstrants demonstrate that no liquor license along MacArthur Boulevard could have been validly issued.

The procedure which the Board followed in this case, especially that of determining the six hundred foot radius and the "neighborhood" after the hearing was over and the petitions already compiled, resulted in the granting of a license in an area where the wishes of the neighborhood were unalterably opposed to the Board's action. The net effect of operating without rules and regulations was that the wishes of the community were by-passed and a decision made arbitrarily contrary to those desires.

In balancing the equities, as the Court must before granting an injunction, the Court has considered the requests made by the plaintiffs for continuances before the Board in order to properly present their case, the speed with which MacArthur Liquors, Inc. moved, so that within *minutes* of the time the license was issued it was doing business at the new address, the continuation of the operation of the liquor store even after knowledge of the Court order, and the precept that a court should only with great caution issue an injunction against a Governmental agency.

After a careful consideration of the records of this case and after weighing all of the above factors, the Court is of the opinion that the motion for preliminary injunction should be granted.

The Court notes that counsel, in his brief and oral argument to the Court,

8. Bureau of Census, Current Population Reports Series P–20, No. 83, Table F p. 4.

has stated the question as one of comparing the relative merits of the site at 5136, where MacArthur Liquors, Inc., is now located, and 4881, where it sought to be transfered. Thus he showed that the Francis Scott Key School was 2/10 of a mile from the old location and 5/10 of a mile from the new; the Palisades Playground 1/10 of a mile (right around the corner) from the old location, 8/10 of a mile from the new; and the Palisades Church 4/10 of a mile before and now 1 1/10 mile. The Florence Crittendon School, a home for unwed mothers and rehabilitation center for young girls, protested the move to 4881, but it, too, is closer to the old location than it is to the present site.

To this same end there has been evidence that the area about 4881 is commercial, or at least more commercial than that about 5136. There are greater parking facilities at 4881 than at 5136, and all in all, from a mercantile point of view, it is a more profitable location.

The Board, too, apparently thought comparative merit to be the issue before it. Thus it found:

"(4) * * * That the proposed premises is located in a substantial shopping center which is zoned for commercial use, and is, in fact, a much preferred location to 5136 MacArthur Boulevard from every standpoint including off the street parking. * * *"

The Court is of the opinion that this misconceives what is really at stake. The question is whether the wishes of the neighborhood and the character of the premises warrant the granting of a liquor license at a given locality. Where that store will come from, what its previous location or history was, is beside the point. The people in the neighborhood of 4881 should not suffer because of a previous erroneous determination. It is not a question of the lesser of two evils. In each case there should be a positive affirmative showing of the propriety of this type of store in the area.

The statute does not contemplate the weighing of localities or sentiments. To these petitioners it is all the same if the store was previously located in the best or worst of areas and by statute their wishes and the character of the premises at the given location are to govern.

This memorandum is to be considered specific findings of fact and conclusions of law.

The motion for a preliminary injunction is granted.